**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SONY MUSIC ENTERTAINMENT, ALAMO RECORDS, LLC, ARISTA MUSIC; ARISTA RECORDS, LLC, LAFACE RECORDS, LLC, RECORDS LABEL, LLC, ULTRA RECORDS, LLC, and ZOMBA RECORDING LLC<br><br>　　　　　　　　Plaintiffs,<br><br>　　　　- against -<br><br>UNIVERSITY OF SOUTHERN CALIFORNIA,<br><br>　　　　　　　　Defendant. | Civil Action No. _____<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiffs Sony Music Entertainment; Alamo Records, LLC; Arista Music; Arista Records, LLC; LaFace Records, LLC; Records Label, LLC; Ultra Records, LLC; and Zomba Recordings LLC (collectively, "Sony Music" or "Plaintiffs") for their Complaint and Demand for Jury Trial against the University of Southern California ("USC" or "Defendant"), allege as follows:

## INTRODUCTION

1.　　This is an action to stop USC's repeated infringement of Sony Music's valuable copyrights in its sound recordings, and to recover damages resulting from USC's willful, unlawful conduct.

2.　　Sony Music and its predecessors have been at the forefront of the recorded music industry for more than a century, and Sony Music produces, manufactures, distributes, sells and licenses some of the most iconic and popular sound recordings of all time.

3.　　USC has one of the most lucrative college sports programs in the world, realizing over $200 million annually in revenues from its participation in a multi-billion dollar college sports

1

industry.  As detailed below, in USC's own words, "we have significant upside and unlimited potential to continue to monetize our athletic program."[1]

4.    USC itself operates and/or controls dozens of social media channels to support USC's commercial activities, which are the channels at issue here (the "USC Social Media Pages"). None of these channels are personal student or faculty accounts.

5.    USC's strategic use of social media marketing has been remarkably broad and successful.  USC's football program led the nation in digital engagement, and amassed nearly 21 million video views across social media platforms in September 2024 alone.[2]

6.    USC leverages this engagement to support its position as a powerhouse in college sports, and to drive increased revenues from advertising and sponsorship partnerships, direct spending on ticket sales and merchandise, and other financial gain.

7.    As far back as June 2021, Sony Music notified USC of its substantial unauthorized use of Sony Music's sound recordings on USC Social Media Pages.

8.    Despite having been on notice of its infringing conduct, USC has repeatedly failed to obtain licenses for its use of Sony Music sound recordings on the USC Social Media Pages, although it has acknowledged that it needs music licenses, that music licenses must be paid for, that music licenses can be expensive, and that music license requests may be denied.  All of this is explained *by USC itself* in its USC Brand and Identity Guidelines for Video and other imagery:

> All music is copyrighted which means prior to featuring it in your video, you must license it through the proper vendors and channels. Many music libraries exist and

---

[1] Ryan Kartje, Los Angeles Times, USC's Jennifer Cohen says Trojans are 'well positioned' for new revenue sharing era (July 22, 2024), https://www.latimes.com/sports/usc/story/2024-07-22/uscs-jennifer-cohen-embracing-revenue-sharing-athletes (last visited Mar. 11, 2025).
[2] USC Athletics, The State of Troy | Sept. 20: USC Athletics Facility Updates, B1G Wins, and More (Sept. 20, 2024), https://usctrojans.com/news/2024/9/20/the-state-of-troy-sept-20-usc-athletics-facility-updates-b1g-wins-and-more.aspx (last visited Mar. 11, 2025).

you can access them online to secure a license for a reasonable fee. If you want to feature "popular music" in your video, as in music you hear on the radio, you must license it from the publishing company and or record company that produced it. **"Popular music" licenses tend to be much more expensive, and the licensing fee varies from piece to piece. Also, requests to license a piece may be denied.** If you are interested in licensing "popular music", contact USC's Office of the General Counsel's office for assistance.[3]

9.      In flagrant disregard of this clear guidance, USC itself has distributed hundreds of videos (if not more) which contain infringing uses of Sony Music's sound recordings, uses that continued even after USC was put on notice of infringement.  These uses were made without permission, without compensation to Sony Music and its artists, and in violation of USC's own written guidelines.

10.     Rather than cease this infringing conduct, USC chose to flaunt copyright law, repeatedly posting new videos to the USC Social Media Pages that use Sony Music sound recordings knowingly and willfully and without permission.  USC even left many uses available online after being put on notice from Sony Music that they were infringing.  USC made the intentional decision not to seek permission or pay for its use of Sony Music's sound recordings.

11.     In January 2023, Sony Music notified USC again of numerous additional unauthorized exploitations of its sound recordings on the USC Social Media Pages.  Sony Music also pointed out the blatantly willful conduct both in continuing to post new infringing videos and in failing to remove the previously identified videos following Sony Music's earlier notice of infringement.

12.     In July 2024, Sony Music notified USC of even further additional unauthorized exploitations of its sound recordings by USC.

---

[3] USC Brand and Identity Guidelines, Imagery, https://identity.usc.edu/identity/imagery/ (last visited Mar. 11, 2025) (emphasis supplied).

13.     As of August 15, 2024, USC and Sony Music entered into an agreement to toll the statute of limitations to allow for settlement discussions to continue, which extended through January 15, 2025.

14.     Despite being fully aware of the unauthorized activities, USC refused to take action to remedy the repeated infringement on the USC Social Media Pages, and when SME requested USC extend the tolling agreement before it expired, USC refused to do so.

15.     USC's repeated infringement is plainly willful, as evidenced by its continuing use of Sony Music's sound recordings in new videos without authorization, despite being given detailed notice concerning its misconduct years ago.

16.     USC's conduct has caused and continues to cause irreparable and substantial harm to Sony Music, while enriching USC at the expense of Sony Music and its artists.

17.     **Exhibit 1** contains a representative list of over 250 videos (the "USC Videos") that were posted by USC across 30 of the USC Social Media Pages, and which contain willful, infringing uses of over 170 Sony Music sound recordings (the "Sony Music Recordings").

18.     Upon information and belief, Sony Music believes that discovery will reveal many more infringing uses of Sony Music's sound recordings on the USC Social Media Pages.

## **PARTIES**

19.     Plaintiff Sony Music Entertainment ("SME") is a Delaware general partnership, engaged in the business of recorded music and headquartered in New York City. SME's principal place of business is located at 25 Madison Avenue, New York, New York 10010.

20.     Plaintiff Alamo Records, LLC ("Alamo") is a Delaware Limited Liability Company with its principal place of business at 25 Madison Avenue, New York, New York 10010.

21.    Plaintiff Arista Music ("Arista Music') is a New York partnership with its principal place of business at 25 Madison Avenue, New York, New York 10010.

22.    Plaintiff Arista Records, LLC ("Arista Records") is a Delaware Limited Liability Company with its principal place of business at 25 Madison Avenue, New York, New York 10010.

23.    Plaintiff LaFace Records, LLC ("LaFace") is a Delaware Limited Liability Company with its principal place of business at 25 Madison Avenue, New York, New York 10010.

24.    Plaintiff Records Label, LLC ("Records Label") is a Delaware Limited Liability Company with its principal place of business at 25 Madison Avenue, New York, New York 10010.

25.    Plaintiff Ultra Records, LLC ("Ultra") is a Delaware Limited Liability Company with its principal place of business at 25 Madison Avenue, New York, New York 10010.

26.    Plaintiff Zomba Recording LLC ("Zomba") is a Delaware Limited Liability Company with its principal place of business at 25 Madison Avenue, New York, New York 10010.

27.    Alamo, Arista Music, Arista Records, LaFace, Records Label, Ultra and Zomba are companies owned by or affiliated with SME.

28.    Sony Music is engaged in the business of producing sound recordings and distributing, selling, and/or licensing the reproduction, distribution, sale, preparation of derivative works based upon, and performance of sound recordings in phonorecords (as defined in 17 U.S.C. § 101), in audiovisual works, and for streaming (*i.e.*, performing) and downloading over the Internet and through other mediums. Sony Music invests substantial money, time, effort, and creative talent in discovering and developing recording artists, and in creating, advertising, promoting, selling, and licensing sound recordings embodying the performances of their exclusive recording artists and their unique and valuable sound recordings.

29.     Defendant USC is a nonprofit corporation, incorporated under the laws of California, with its principal place of business in Los Angeles, California.

## JURISDICTION AND VENUE

30.     This is a civil action seeking damages and injunctive relief for copyright infringement under the Copyright Act, 17 U.S.C. § 101, et seq.

31.     This Court has original subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338(a).

32.     This Court has personal jurisdiction over USC on numerous grounds. USC transacts substantial business within New York.  USC maintains a "University Advancement" Office in New York City at 600 Madison Avenue, conducts academic programs in New York, organizes events in New York relating to recruiting, admissions, networking and sports, and maintains an active alumni club in New York.  Upon information and belief, New York residents have donated substantial sums to USC through its New York advancement office, paid tuition for USC academic programs conducted in New York, and participated in USC's New York recruiting and networking events.

33.     USC participates in a multi-billion dollar sports industry, generating hundreds of millions in revenue, a substantial portion of which comes from interstate commerce including media rights agreements. USC participates in media rights agreements that ensure USC's athletic competitions are regularly broadcast into New York, targeting a substantial audience of USC fans, prospective students, alumni, and donors in the state. USC's videos drive traffic to its website where New York residents can purchase tickets and merchandise. Upon information and belief, New York residents have purchased USC merchandise and tickets to USC sporting events.

34.    The infringing videos and USC's New York activities are part of the same integrated marketing strategy designed to enhance USC's brand, expand its reach, and increase its revenues. USC's copyright infringement outside of New York caused injury to Sony Music within New York and USC expects or should reasonably expect its acts to have consequences in New York. USC derives substantial revenue from interstate commerce, including from efforts aimed at New York as described above. USC has been repeatedly notified of its copyright infringement since June 2021 and yet it continued to distribute infringing content, demonstrating USC knows its activities had an impact outside of California, including directly affecting Sony Music in New York.

35.    USC's purposeful activities directed at New York are substantial, and the exercise of jurisdiction comports with traditional notions of fair play and substantial justice.  Moreover, USC's vigorous defense of its own intellectual property rights demonstrates its understanding of intellectual property laws and the types of harm that occur when such rights are violated.

36.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and 28 U.S.C. § 1400(a). Venue is proper because, *inter alia*, USC "may be found" in this District, and is subject to personal jurisdiction here, for the reasons set forth above.

## SONY MUSIC'S BUSINESS

37.    Sony Music is home to some of the world's most distinguished record labels, including Columbia Records, RCA Records, Sony Nashville, Arista Records, Ultra Records, and Epic Records, through which it contracts with its world-class recording artists.

38.    Through substantial investments of money, time, and creative effort, Sony Music and its recording artists have developed some of the most iconic sound recordings of all time, as well as many of today's biggest hits.

39.    Sony Music also invests heavily in signing and developing new artists, and in marketing and promoting their recordings.

40.    Sony Music often invests on the front end of an artist's career – through advances, recording, marketing, creative services, promotion, and more – looking to help the artist, and the artist's recordings, achieve success.

41.    Sony Music's financial incentives to invest in artists and their music flow directly from the protections afforded by copyright laws, and the revenues Sony Music earns from the sound recordings that it owns or controls, which include revenues from licensing recordings for use in social media posts.

42.    The investments made by Sony Music are protected by copyright law, which grants the copyright owner the exclusive right to, among other things, reproduce and distribute copyrighted works (in this case, sound recordings), publicly perform and transmit those works, and create derivative works from the originals.

43.    Licensing the use of sound recordings, including for use in internet-based media, is a substantial revenue driver for all music companies, including Sony Music, especially over the last decade.

44.    Those who use Sony Music's sound recordings, whether on streaming services, social media platforms, television, or otherwise, are obligated to follow copyright laws and obtain permission from Sony Music.

45.    Sony Music has licensing agreements with a wide range of companies, including major brands and sports teams that invest heavily in digital marketing.  These organizations pay substantial sums to license Sony Music sound recordings for use in digital advertising content, including videos posted on platforms such as YouTube, Instagram, Facebook, and TikTok.  By

using Sony Music's copyrighted sound recordings without authorization, USC not only avoids paying licensing fees but also gains an unfair competitive advantage in attracting sponsors, advertising partners, fans and potential athletes and other students.[4]

46.    Each Sony Music Recording is either: (a) covered by a valid copyright registration; (b) one for which Sony Music has the rights to pursue these claims for sound recordings originating outside of the United States under the Berne Convention; or (c) is a sound recording fixed before February 15, 1972, and included on a schedule filed with the Copyright Office pursuant to the Orrin G. Hatch-Bob Goodlatte Music Modernization Act.

47.    As the owner of copyrights in the Sony Music Recordings, Sony Music possesses the exclusive rights to, among other things, reproduce in copies or phonorecords, to prepare derivative works, to distribute copies or phonorecords to the public, to perform publicly by means of a digital audio transmission, and to license these exclusive rights, including for use in internet-based media.

## USC'S REPEATED INFRINGEMENT

### A.  USC's Reliance on Social Media and Digital Platforms

48.    USC is a private research university in Los Angeles, California.  For the fiscal year ending June 30, 2024, USC reported operating revenues of more than $7 billion, which included

---

[4] *See, e.g.*, Cristian Perez, Social Media Is Changing How Sports Franchises and Fans Interact, USC Annenberg School for Communication and Journalism (Feb. 16, 2017), https://annenberg. usc.edu/communication/digital-social-media-ms/dsm-today/social-media-changing-how-sports-franchises-and-fans ("As a growing number of Americans are engaging on platforms like Twitter, Instagram and Facebook, companies are increasingly relying upon social media to market their products and engage with their clients—sports teams are no exception.") (last visited Mar. 11, 2025).

$320 million in "auxiliary enterprises" revenues, which includes revenues generated from athletics.[5]

49.    USC has one of the most lucrative college sports programs in the world, and its intercollegiate sports teams, the Trojans, are internationally recognized.

50.    USC participates in a multi-billion dollar college sports industry, and is one of the top programs in annual revenue.  USC reported $212 million in total athletics revenue for the 2022-2023 school year, underscoring its position as a powerhouse in collegiate athletics.[6]  Upon information and belief, this substantial revenue is derived largely from media rights, sponsorships, royalties and licensing, ticket sales and merchandise.[7]  Upon information and belief, USC also financially benefits from increased USC brand licensing that occurs alongside increased Name, Image, and Likeness (NIL) activities flowing from the increased engagement generated by the USC Videos.

51.    USC's sports programs bear the hallmarks of a commercial enterprise.  USC's football coach Lincoln Riley was paid more than $19 million in the 2023 fiscal year, one of the highest paid college football coaches in the nation.  In August 2024, USC switched athletics conferences to join the Big Ten Conference, which forecasts television revenues of $80 to $100

---

[5] Consolidated Financial Statements For the Years Ended June 30, 2024 and 2023 (Nov. 20, 2024), https://bpb-us-w1.wpmucdn.com/sites.usc.edu/dist/d/791/files/2024/11/2024-USC-Financial-Report.pdf (last visited Mar. 11, 2025).

[6] Ryan Kartje, Los Angeles Times, USC's Jennifer Cohen says Trojans are 'well positioned' for new revenue sharing era (July 22, 2024), https://www.latimes.com/sports/usc/story/2024-07-22/uscs-jennifer-cohen-embracing-revenue-sharing-athletes (last visited Mar. 11, 2025).

[7] Andrew Zimbalist, PBS, Analysis: Who is winning in the high-revenue world of college sports? (Mar. 18, 2023), https://www.pbs.org/newshour/economy/analysis-who-is-winning-in-the-high-revenue-world-of-college-sports (last visited Mar. 11, 2025).

million annually per school.[8]  In July 2024, USC's Athletic Director Jennifer Cohen explained in an interview with the Los Angeles Times: "All athletic directors are thinking 24/7 about revenue generation . . . The good news for us at USC is we have significant upside and unlimited potential to continue to monetize our athletic program, so we've got to roll up our sleeves."[9]  The same article detailed some of USC's planned investments in sports programs: "A $38-million stadium for women's soccer and lacrosse is expected to open next fall. A three-level football performance center and gleaming practice field will be ready in 2026, followed by a repositioned baseball complex to replace Dedeaux Field, which was demolished to accommodate the football facility."

52.    Social media is a crucial and valuable marketing tool that USC uses to promote its brands and sports programs, and ultimately increase its "auxiliary enterprise" revenues.  Indeed, USC recognizes that "[b]uilding a social media presence is an excellent way to extend your presence online and promote content in an environment that allows your audience to engage with the university brand."[10]

53.    USC actively utilizes the USC Social Media Pages to share promotional videos designed to attract attention, expand its reach, enhance its reputation, and increase its revenues. These videos aim to appeal to prospective students, donors, fans and customers.

54.    USC's strategic approach to digital media is especially true for USC's athletics program.  For example, USC maintains an athletics "Social Media Directory" – the purpose of

---

[8] Adam Rittenberg, Big Ten Completes 7-Year, $7 Billion Media Rights Agreement with Fox, CBS, NBC, ESPN (Aug. 18, 2022), https://www.espn.com/college-football/story/_/id/34417911/big-ten-completes-7-year-7-billion-media-rights-agreement-fox-cbs-nbc (last visited Mar. 11, 2025).
[9] Kartje, USC's Jennifer Cohen, *supra*.
[10] University of Southern California, USC Brand and Identity Guides: Social Media, https://identity.usc.edu/applying-the-brand/social-media-2/ (last visited Mar. 11, 2025).

which is solely to identify the Facebook, Instagram and X accounts for USC's individual athletic departments.[11]

55.    Upon information and belief, USC has spent significant time and resources in building the USC Social Media Pages, which have been successful and resulted in significant engagement, enhancing USC's revenues substantially.   In September 2024, USC's football program led the nation in digital engagement, amassing nearly 21 million video views across social media platforms alone.[12]

56.    The USC Videos have been made publicly available online by USC on social media accounts that USC either owns or controls, and that make extensive use of USC's branding and logos – on both the social media accounts and within the USC Videos themselves.

**B.  USC's Infringing Videos**

57.    USC recognizes the importance of music to its marketing strategy, and has implemented an intentional strategy to pair its videos with popular music to enhance its marketing success.

58.    To help popularize the USC Videos, USC intentionally added Sony Music's well-known copyrighted works to the videos.  The Sony Music Recordings constitute the soundtrack to the videos, usually running the length of the video and including the most recognizable parts of the tracks, such as the hook or chorus.

---

[11] Social Media Directory, https://usctrojans.com/sports/2017/10/31/usc-athletics-social-media-directory (last visited Mar. 11, 2025).

[12] USC Athletics, The State of Troy | Sept. 20: USC Athletics Facility Updates, B1G Wins, and More (Sept. 20, 2024), https://usctrojans.com/news/2024/9/20/the-state-of-troy-sept-20-usc-athletics-facility-updates-b1g-wins-and-more.aspx (last visited Mar. 11, 2025).

59.     USC has used extremely popular selections from Sony Music's catalog in the USC Videos, to tie USC's brand to the iconic success of Sony Music artists and the instant recognition and good will of classic hits, such as "Gimme More" by Britney Spears,  "Run the World (Girls)" by Beyoncé, "Beat It" by Michael Jackson, "Back in Black" by AC/DC, "Yeah!" by Usher featuring Lil Jon & Ludacris, "As It Was" by Harry Styles, "September" by Earth, Wind and Fire, "All I Want for Christmas is You" by Mariah Carey, "My Heart Will Go On" by Céline Dion, and many others.

60.     USC also exploits Sony Music's hit recordings when they have just been released and are at the top of the charts.  "Like That" by Future, Metro Boomin, and Kendrick Lamar was an instant hit when it was released in late March 2024, debuting at #1 on the Billboard Hot 100. Within days, USC was using the newly-released hit without permission as the full soundtrack to multiple videos on USC Social Media Pages for at least three different sports.

61.     USC's selection of the specific Sony Music Recordings for the USC Videos was deliberate, meant to maximize attention to USC and its prominent sports programs, and boost its overall brand and auxiliary enterprise revenues.

62.     As discussed in business articles, the use of music in advertisements suggests that music makes campaigns more memorable and effective and "keep[s] viewers interested and wanting more."[13]

---

[13] Lisa Montenegro, Forbes Agency Council, Boosting the Creative Journey: How Brands and Creators Can Use Instagram's Latest Updates, Forbes (Sept. 8, 2023), https://www.forbes.com/sites/forbesagencycouncil/2023/09/08/boosting-the-creative-journey-how-brands-and-creators-can-use-instagrams-latest-updates/ (last visited Mar. 11, 2025).

63.    A study conducted by TikTok confirms that "using a trending song in . . . content is a great way to capture [the] community's attention" and that "67% of TikTok users would prefer to see videos from brands featuring popular or trending songs on TikTok."[14]

64.    As TikTok confirms, "music is at the heart of the TikTok experience" and is "the glue that connects TikTok's disparate threads."[15]

65.    According to another study commissioned by TikTok in Australia, "the number of people using TikTok in Australia fell after the company limited the music some people could put in their posts."[16] The study concluded that TikTok (and presumably other social media platforms) is dependent on its access to popular songs.[17]

66.    Many of the USC Videos prominently display USC's names and logos (e.g., "USC," "SC" or "USC Trojans") and are deliberately branded, often accompanied by the address for the USC Trojans website.

67.    Once directed to the USC Trojan website, viewers can buy tickets[18] and merchandise,[19] as well as get information on upcoming games[20] and USC sports teams.[21]    The

---

[14] TikTok, New studies quantify TikTok's growing impact on culture and music (Dec. 13, 2021), https://newsroom.tiktok.com/en-us/new-studies-quantify-tiktoks-growing-impact-on-culture-and-music (last visited Mar. 11, 2025).

[15]    TikTok, Year on TikTok 2021, Music Report, https://newsroom.tiktok.com/en-us/year-on-tiktok-music-report-2021 (last visited Mar. 11, 2025).

[16] Bloomberg, TikTok Lost Customers When It Took Away Music in Australia (Mar. 22, 2023), https://www.bloomberg.com/news/articles/2023-03-22/tiktok-lost-customers-when-it-took-away-music-in-australia (last visited Mar. 11, 2025).

[17] *Id.*

[18] *See e.g.*, USC Trojans Ticket Sales, https://usctrojans.evenue.net/list/ATH (last visited Mar. 11, 2025).

[19] *See e.g.*, USC Trojans Official Store, https://shop.usctrojans.com (last visited Mar. 11, 2025).

[20] *See e.g.*, USC Trojans Events Calendar, https://usctrojans.com/calendar (last visited Mar. 11, 2025).

[21] *See e.g.*, USC Trojans Athletics, https://usctrojans.com (last visited Mar. 11, 2025).

USC Videos are advertisements for customers of USC products and services (e.g., tickets and merchandise), and serve to increase USC's operating revenues.

68.    For example, on September 1, 2024 (well after being on notice of unauthorized use of the Sony Music Recordings), USC Football uploaded to the USC Social Media Pages a polished and professional advertising "hype" video using advanced CGI graphics and entitled "2024 USC Football: Arrival of the Trojan—Season Trailer" (the "2024 Trojan Hype Video").  The 2024 Trojan Hype Video promoted USC's upcoming football season, featuring as an unlicensed soundtrack Sony Music's sound recording "Like That" by Future, Metro Boomin, and Kendrick Lamar.  The 2024 Trojan Hype Video original YouTube post alone was viewed over 100,000 times and generated substantial media coverage that affiliated USC with the Sony Music "hit song," boosting USC's reputation as a marquee sports program [22] that is, *inter alia*, deserving of participation in the multi-billion dollar Big Ten Conference television deal.[23]

69.    Numerous other USC Videos reflect similarly intentional strategic marketing that uses the tremendous goodwill built by Sony Music and its artists for USC's benefit, without permission and in contravention of copyright law.

70.    USC is well aware that these kinds of uses are commercial in nature.  USC actively seeks to protect and enforce its own intellectual property against commercial use.  For example, in

---

[22] After going viral on social media, the 2024 Trojan Hype Video was played in stadium as the walk out song for the Trojans before games.

[23] See, e.g., College Football Fans Absolutely Loved USC's Epic Hype Video for 2024 Season, Sports Illustrated (Aug. 9, 2024), https://www.si.com/college-football/usc-hype-video-2024-fans-loved; USC Hype Video Goes Viral Ahead of Marquee LSU Matchup, Newsweek (Aug. 9, 2024), https://www.newsweek.com/sports/ncaa/usc-hype-video-goes-viral-ahead-marquee-lsu-matchup-1947267; USC Trojans Reveal Jaw-Dropping Hype Video Ahead of Huge LSU Clash, The U.S. Sun (Aug. 9, 2024), https://www.the-sun.com/sport/12344249/usc-football-hype-video-lsu/ ("[T]he clip displayed the players celebrating as the Metro Boomin hit song Like That played in the background.").

its detailed NIL Policy for student-athletes – in addressing the wearing of USC apparel – it explains that "the wearing of apparel in promotions pictures, videos, or advertisements is typically commercial activity beyond incidental use."[24]  Indeed, the USC Videos themselves generally feature people wearing USC apparel, often alongside other uses of USC logos and marks.

71.    USC has also vigorously defended its own trademark and related intellectual property against others. *See e.g., Univ. of S.C. v. Univ. of S. Cal.*, 467 F. App'x 129 (Fed. Cir. 2010).  USC plainly understands the intellectual property rights at issue, as well as the types of harm that occur when intellectual property rights are violated, and cannot disclaim responsibility for its own actions in derogation of such rights.

72.    Sony Music (and other record labels) has built an extensive business licensing its sound recordings for use in videos like those at issue here, including for use in social media advertisements.  Sony Music derives substantial revenue from this sector of its business, which it shares with its artists.

73.    Many artists also exercise approval rights relating to licensing of their music, and are selective in granting their consent.  USC's unauthorized exploitation thus not only deprives artists of compensation, but also of their ability to choose how or where their music is used.

74.    USC even acknowledges in its own Video and Social Media Guidelines that it needs a license to use copyrighted music in the USC Videos.  Yet, USC did not obtain a license to use the Sony Music Recordings in any of the videos, instead choosing to exploit the Sony Music Recordings to enhance its videos without permission, directly depriving Sony Music and its artists of due compensation.

---

[24] *See* USC Athletics, Student – Name, Image, and Likeness (NIL) Policy, https://policy.usc.edu/usc-athletics-student-athlete/ (last visited Mar. 11, 2025).

75.    Notably, upon information and belief, USC's rampant infringement is not limited to content controlled by Sony Music.  In addition to the hundreds of representative infringements that Sony Music has identified herein, USC has used, without permission, many sound recordings owned and controlled by numerous other record labels, as well as musical compositions owned and controlled by numerous music publishers.

### USC'S INFRINGEMENT IS WILLFUL

76.    As detailed above, on multiple occasions since June 2021, Sony Music has notified USC of posts on the USC Social Media Pages that contain infringing content.

77.    Shortly after the first notice, USC's representative replied that USC had removed all of the identified videos from its social media accounts, although it had not done so.  USC failed to produce any license for the uses of Sony Music Recordings in the USC Videos or offer compensation to Sony Music for past infringement.

78.     Instead, USC chose to continue using unlicensed Sony Music Recordings in new videos.  USC even uploaded videos in 2024 featuring the same sound recordings that Sony Music had already identified to USC in 2021 as being used in other videos.

79.    USC also continued to maintain on the USC Social Media Pages many specific previously-identified videos even after Sony Music gave notice of those specific infringements, and USC thereby continued to benefit from its infringing acts.

80.    Indeed, *all* of the representative infringements identified in **Exhibit 1** were posted by USC *after* Sony Music had already identified other specific infringing conduct on the USC Social Media Pages.

81.    Further demonstrating USC's willfulness, the terms of service for each of the social media platforms on which USC posted the infringing conduct make clear that the use of

copyrighted music without a license is strictly prohibited, and detail specific prohibitions in connection with commercial activities.

82.    For example, YouTube's Terms of Services[25] unmistakably provide that content uploaded to YouTube "must not include third-party intellectual property (such as copyrighted material) unless [a user] ha[s] permission from that party or [is] otherwise legally entitled to do so."

83.    Facebook's Music Guidelines,[26] also provide that "[u]se of music for commercial or non-personal purposes in particular is prohibited unless you have obtained appropriate licenses."

84.    Instagram's Terms of Use[27] incorporate Facebook's Music Guidelines and likewise prohibit use of music for commercial or non-personal purposes without an appropriate license.[28]

85.    Instagram further expressly acknowledges that the "music available in [its music] library is intended for personal, non-commercial use."[29]

86.    TikTok's Intellectual Property Policy likewise provides: "TikTok respects the intellectual property rights of others, and we expect you to do the same.  TikTok's Terms of Service and Community Guidelines *do not allow posting, sharing, or sending any content that violates or infringes someone else's copyrights*, trademark or other intellectual property rights."[30]

---

[25] YouTube, Terms of Service, https://www.youtube.com/static?template=terms (last visited Mar. 11, 2025).
[26] Facebook, Music Guidelines, https://www.facebook.com/legal/music_guidelines (last visited Mar. 11, 2025).
[27] Instagram, Terms of Use, https://help.instagram.com/termsofuse (last visited Mar. 11, 2025).
[28] For certain commercial uses, Instagram permit royalty-free access to a select collection of music through Facebook's Sound Collection. None of Sony Music's Sound Recordings in the USC Videos are included within the Sound Collection.
[29] Facebook, Business Help Center, Access to the licensed music library on Instagram, https://www.facebook.com/business/help/402084904469945 (last visited Mar. 11, 2025).
[30] TikTok, Intellectual Property Policy, https://www.tiktok.com/legal/copyright-policy?lang=en (last visited Mar. 11, 2025) (emphasis added).

87.     In fact, TikTok's Terms of Service unambiguously provide (all caps in original):

NO RIGHTS ARE LICENSED WITH RESPECT TO SOUND RECORDINGS AND THE MUSICAL WORKS EMBODIED THEREIN THAT ARE MADE AVAILABLE FROM OR THROUGH THE SERVICE.[31]

88.     Moreover, since prior to the date when each of the USC Videos was posted to TikTok, TikTok has required business account users to first click-through a Music Usage Confirmation before posting videos with copyrighted music such as the Sony Music Recordings. In order to post such videos, the user must confirm that (a) it owns all rights to the music, (b) there is no copyright protected music in the video or (c) the user has obtained and paid for all necessary licenses to use the music.[32]  An example of the current Music Usage Confirmation that must be made prior to posting is as follows:



---

[31] Tik Tok, Terms of Service, Content, https://www.tiktok.com/legal/page/us/terms-of-service/en (last visited Mar. 11, 2025).

[32] TikTok, Music Usage Confirmation, https://www.tiktok.com/legal/page/global/music-usage-confirmation/en (last visited Mar. 11, 2025); TikTok, Commercial Use of Music on TikTok, https://support.tiktok.com/en/business-and-creator/creator-and-business-accounts/commercial-use-of-music-on-tiktok (last visited Mar. 11, 2025).

89.     Thus, upon information and belief, before posting USC Videos to TikTok, USC falsely confirmed that either it was not using copyrighted music or that it had a license to use the Sony Music Recordings.

90.     Each time USC created an account on these platforms, it was required to, and did, agree to each of their terms of use.

91.     USC is well aware that its conduct constitutes copyright infringement.  Upon information and belief, USC expends substantial resources to create and develop its intellectual property, including its social media content.  Indeed, USC maintains guidelines for videos and other imagery posted on USC's websites and social media accounts which, according to USC, "must follow and respect U.S. copyright laws." [33]

92.     Similarly, USC's Social Media Guidelines explicitly direct users of USC Social Media Accounts to: "Follow all copyright, fair use, and respect intellectual property rights" and "Do not use assets that you do not have explicit permission to use from the owner." [34]

93.     With respect to music used in videos posted on USC's websites and/or social media accounts, USC Brand and Identity Guidelines explicitly note that:

> USC considers all websites and social media platforms to be marketing tools and under copyright law, the "user" (USC) must hold the copyright for any photographs, music or videos posted on those platforms. Even though USC is licensing the content to the website or social media platform, the onus remains on the USC to possess the copyright or license and to follow and respect copyright laws. If you are planning to post a video to a website or social media platform, you cannot feature photographs, music, videos, or even video clips you may have "found" on

---

[33] USC Brand and Identity Guidelines, Imagery, https://identity.usc.edu/identity/imagery/ (last visited Mar. 11, 2025).
[34] USC Brand and Identity Guidelines, Social Media, https://identity.usc.edu/applying-the-brand/social-media-2/ (last visited Mar. 11, 2025).

the internet unless you possess the copyright for them and/or have properly licensed those assets.[35]

94.    USC's policies for the USC Social Media Pages also make clear the control that USC has over these channels.  For example, school units setting up these channels are instructed to, *inter alia*:

> Identify a full-time employee dedicated to managing your unit's social media content and conversation monitoring. The primary user's supervisor should have full administrative rights to all social media accounts. A content operations plan should include regular check-ins with the primary user's supervisor to discuss the health of each respective platform.
> …
> Do not give control and use of your official USC social media accounts to anyone outside your business unit's immediate communications team.[36]

95.    The USC Trojans Staff Directory includes an entire division of staff related to "CREATIVE CONTENT/SOCIAL MEDIA."  This division includes a C-level Officer (Chief Creative Officer), a Director of Social Media, an Assistant Director of Social Media, and others.[37]

96.    Despite the foregoing, USC has posted numerous USC Videos exploiting Sony Music Recordings to YouTube, Facebook, Instagram and TikTok, in blatant disregard of Sony Music's rights as well as each of the platforms' terms of use.  USC has neither obtained, nor made any effort to obtain, permission from Sony Music to use the Sony Music Recordings in the USC Videos.

---

[35] USC Brand and Identity Guidelines, Imagery, https://identity.usc.edu/identity/imagery/ (last visited Mar. 11, 2025).

[36] USC Brand and Identity Guidelines, Social Media, https://identity.usc.edu/applying-the-brand/social-media-2/ (last visited Mar. 11, 2025).

[37] USC Trojans, Staff Directory, https://usctrojans.com/staff-directory (last visited Mar. 11, 2025).

## COUNT I

## COPYRIGHT INFRINGEMENT

97.    Sony Music incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

98.    By the acts set forth above, USC has infringed Sony Music's copyrights in the Sony Music Recordings, including by reproducing, distributing, and publicly performing by way of digital transmission of the Sony Music Recordings without authorization, in violation of the Copyright Act, 17 U.S.C. §§ 106 and 501.

99.    Each such infringement by USC of the Sony Music Recordings constitutes a separate and distinct act of infringement.

100.    USC's acts of infringement are willful, in disregard of and with indifference to the rights of Sony Music.

101.    As a direct and proximate result of the infringements by USC, Sony Music is entitled to its damages and to USC's profits attributable to the infringement in amounts to be proven at trial.  Alternatively, Sony Music is entitled to statutory damages up to the amount of $150,000 for each copyright infringed, or in such other amount as may be proper under 17 U.S.C. § 504(c).

102.    Sony Music is further entitled to its attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

## COUNT II

## VICARIOUS INFRINGEMENT

103.    Sony Music incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

104.   If USC is not directly liable for the infringing conduct within the USC Videos on the USC Social Media Pages, then it is at least vicariously liable for such conduct.

105.   As described above, USC has the right, ability, and authority to control and supervise the creation and posting of videos created or posted on the USC Social Media Pages.

106.   USC has failed to exercise its right and ability to control and/or supervise the infringing activity on the USC Social Media Pages.

107.   As described above, USC receives a direct financial benefit from infringing videos posted on the USC Social Media Pages.

108.   The exploitation of the Sony Music Recordings on the USC Social Media Pages saves USC the cost of a license, increases USC's revenues, and drives users to the USC Social Media Pages that promote the USC brands and sports programs. USC's failure to take any action has caused the USC Social Media Pages to continue to include the Sony Music Recordings without authorization.

109.   Sony Music has been damaged, and will continue to be damaged, by USC's knowing, deliberate and willful acts of vicarious infringement.

110.   Sony Music is entitled to injunctive relief prohibiting USC from further acts of vicarious infringement.

111.   As a direct and proximate result of USC's vicarious infringement of Sony Music's copyrights and exclusive rights under copyright, Sony Music is entitled to its actual damages, including USC's profits attributable to the infringement, in amounts to be proven at trial, pursuant to 17 U.S.C. § 504(b), or, in the alternative, at Sony Music's election pursuant to 17 U.S.C. § 504(c), to statutory damages up to the amount of $150,000 per infringed work, or such other amounts as may be proper under 17 U.S.C. § 504(c).

112.    Sony Music is entitled to its costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

## COUNT III

## CONTRIBUTORY INFRINGEMENT

113.    Sony Music incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

114.    If USC is not directly liable for the infringing USC Videos on the USC Social Media Pages, USC is at least contributorily liable for the infringing USC Videos posted on the USC Social Media Pages.

115.    As described above, USC induced and/or materially contributed to the infringing USC Videos posted on the USC Social Media Pages.  USC's contribution further included the activities of an entire department dedicated towards fostering social media engagement for its athletics program, creating internal support which, upon information and belief, directly contributed to the proliferation of the USC Videos.  USC's contribution also included providing explicit guidelines and guidance on using social media effectively.

116.    As described above, USC knew, had reason to know, or was willfully blind that its USC Social Media Pages were being used to distribute the USC Videos that contain unlicensed copyrighted works.  USC received specific notice of infringing activities on the USC Social Media Pages, including in the USC Videos.  Further, upon information and belief, USC employees and/or agents supervised the USC Social Media Pages and actively reviewed infringing content that was posted to the USC Social Media Pages.

117.    To the extent USC does not have actual knowledge, the systematic infringement on the USC Social Media Pages combined with USC's substantial investment in social media

24

marketing generally, establishes that USC is aware of a high probability of infringement on the USC Social Media Pages, both consciously and intentionally.

118.    USC's conduct constitutes willful contributory copyright infringement.

119.    Sony Music has been damaged, and will continue to be damaged, by USC's acts of contributory infringement.

120.    Sony Music is entitled to injunctive relief prohibiting USC from further acts of contributory infringement.

121.    In addition, as a direct and proximate result of USC's contributory infringement of Sony Music's copyrights and exclusive rights under copyright, Sony Music is entitled to its actual damages, including USC's profits attributable to the infringement, in amounts to be proven at trial, pursuant to 17 U.S.C. § 504(b), or, in the alternative, at Sony Music's election pursuant to 17 U.S.C. § 504(c), to statutory damages up to the amount of $150,000 per infringed work, or such other amounts as may be proper under 17 U.S.C. § 504(c).

122.    Sony Music is entitled to its costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

## PRAYER FOR RELIEF

**WHEREFORE,** Sony Music respectfully requests the Court enter a judgment in its favor and against USC:

a.    A declaration that USC has willfully infringed Sony Music's copyrighted sound recordings in violation of the Copyright Act;

b.    A permanent injunction enjoining USC and its respective agents, employees, officers, principals, attorneys, directors, representatives, licensees, partners and assignees, and all persons acting in concert with any one of them, to cease and desist

from directly and indirectly infringing, and causing, enabling, facilitating, encouraging, promoting, inducing and/or participating in the infringement of, any of Sony Music's rights protected by the Copyright Act, including but not limited to the sound recordings set forth in Exhibit 1 to the Complaint;

c.      An order requiring USC to render a full and complete accounting to Sony Music for USC's profits, gains, advantages, and the value of the business opportunities received from its infringing activities;

d.      For statutory damages pursuant to 17 U.S.C. § 504(c) for USC's willful infringement in the amount of $150,000 with respect to each copyrighted work or, in the alternative, at Sony Music's election, Sony Music's actual damages and USC's profits attributable to the infringement pursuant to 17 U.S.C. § 504(b), in an amount to be proven at trial;

e.      For Sony Music's reasonable attorneys' fees and costs pursuant to 17 U.S.C. § 505;

f.      For pre-judgment and post-judgment interest according to law; and

g.      For such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Sony Music respectfully demands a trial by jury on all claims and issues so triable pursuant to Federal Rule of Civil Procedure 38.

Dated:      New York, New York                    PRYOR CASHMAN LLP
            March 11, 2025

                                                   */s/ Benjamin K. Semel*
                                                   Benjamin K. Semel, Esq.
                                                   Kaveri Arora, Esq.
                                                   PRYOR CASHMAN LLP
                                                   7 Times Square

New York, NY 10036
(212) 421-4100
bsemel@pryorcashman.com
karora@pryorcashman.com
*Attorneys for Plaintiffs Sony Music
Entertainment, Alamo Records, LLC,
Arista Music, Arista Records, LLC,
LaFace Records, LLC, Records Label,
LLC, Ultra Records, LLC, and Zomba
Recordings LLC*