IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

*(Sony Music Entertainment, et al. v. University of Southern California)*

Case No. 1:25-cv-02042 (GHW)



**BRIEF OF AMICUS CURIAE**

**INDEPENDENT ARTISTS AND SONGWRITERS**

**IN SUPPORT OF NEITHER PARTY**

**Date:** December 24, 2025

**INTEREST OF AMICUS CURIAE**

Amici are independent music creators, songwriters, and small rights-holding entities whose works are distributed, licensed, monetized, attributed, and enforced through digital platforms and automated intermediary systems. Amici do not advocate for either party's position. They submit this brief to assist the Court in understanding **structural features of modern copyright licensing and enforcement architectures** that increasingly govern public-facing institutions and that implicate administrability, reliance, error allocation, and foreseeable systemic harm.

Nothing in this brief challenges the legitimacy of copyright protection, the existence of exclusive rights, or the entitlement of rights holders to compensation. Amici's interest is limited to ensuring that enforcement regimes relying on automation, metadata, aggregation, and notice-based escalation remain **coherent, transparent, and capable of fair application when extended beyond their original commercial design context**.

---

## SUMMARY OF ARGUMENT

This case does not concern whether copyright exists, whether music has value, or whether licenses may be required. It concerns a **present-tense contradiction** embedded in the architecture of modern copyright licensing and enforcement.

At the same time that rights holders license music at scale through platform-level agreements designed to enable widespread digital use, those same rights holders pursue infringement actions premised on the absence of authorization for materially indistinguishable uses occurring within the same platform environments.

These positions are not sequential or alternative. **They operate concurrently.**

If platform-scale licensing is sufficient to authorize widespread digital use, downstream reliance on that licensing cannot itself constitute infringement.
If downstream reliance is insufficient, platform-scale licensing cannot function as a meaningful authorization mechanism.
Both propositions cannot govern the same uses at once.

2

Universities do not design, control, or meaningfully audit the automated attribution, metadata, and notice systems that generate enforcement claims. Yet they are increasingly subject to statutory-damages exposure based on automated determinations that offer **no intelligible ex ante mechanism for clarification, exhaustion, or correction.**

Although a private institution, the University of Southern California is public-facing and functions as cultural infrastructure. When automated enforcement systems migrate from private commercial platforms into educational contexts, **private enforcement architecture begins to operate as public governance by default,** shaping lawful participation through over-deterrence rather than through transparent, prospective rules.

The Court need not resolve contractual disputes or assess fault to recognize this structural condition. It may acknowledge that **systems designed for private commercial enforcement operate differently—and more harshly—when applied to institutions lacking the access, leverage, and technical capacity those systems assume.**

---

# ARGUMENT

## I. AUTOMATED ENFORCEMENT SYSTEMS DESIGNED FOR COMMERCIAL PLATFORMS NOW GOVERN UNIVERSITIES

Modern copyright enforcement relies on automated attribution, metadata matching, and notice-based escalation systems. These systems were developed to manage scale and risk within commercial platforms hosting millions of users and works.

The same systems are now deployed against universities for platform-mediated uses of music. The enforcement logic does not distinguish between a retail marketing campaign and a university's public-facing communications. The architecture is identical; only the target differs.

This reflects **system expansion, not individualized assessment**.

## II. UNIVERSITIES LACK THE CAPACITY ASSUMED BY AUTOMATED ENFORCEMENT ARCHITECTURE

Automated enforcement systems assume that alleged infringers can audit attribution and metadata determinations, trace licensing pathways across platforms and intermediaries, correct errors through technical or contractual channels, and absorb or negotiate enforcement risk at scale.

4

Even the most resourced institutions cannot audit systems designed to be non-auditable at the user level. Universities generally lack continuous access to platform-level metadata, algorithmic decision logic, and overlapping licensing arrangements that govern authorization.

As a result, liability is imposed **without a corresponding ability to prevent or correct error ex ante**. This is not a question of sophistication or diligence. It is a mismatch between system design and institutional reality.

---

# III. LICENSING AND ENFORCEMENT REST ON MUTUALLY EXCLUSIVE ASSUMPTIONS

The licensing posture assumes that aggregation provides sufficient authorization and that reliance on platform-mediated systems is reasonable.

The enforcement posture assumes that downstream actors bear independent clearance responsibility and that reliance on aggregation is insufficient.

A system that requires reliance in order to function, while treating that same reliance as a basis for liability, provides **no stable state of compliance**. Authorization is defined only retrospectively—after attribution, notice, and escalation—rather than prospectively through intelligible, user-visible rules.

This contradiction arises from architecture, not intent.

---

## IV. LIABILITY IS FUNCTIONALLY ASSIGNED BY ACCESS, NOT USE CHARACTERISTICS

Because identical categories of use are treated as authorized in some channels and infringing in others, liability risk turns on **access to parallel licensing pathways**, not on the nature of the use itself.

Institutions able to purchase or negotiate additional layers of licensing are treated as authorized. Institutions operating within the same platform environments but lacking access to those channels face enforcement risk for materially indistinguishable conduct.

Courts have long been cautious of regimes in which liability turns on identity or access rather than behavior, particularly where governing standards are not publicly intelligible.

---

## V. STATUTORY DAMAGES MAGNIFY THE RISK OF OVER-DETERRENCE

When automated enforcement is coupled with statutory damages, the resulting risk profile is asymmetric. Minor or incidental uses can trigger exposure far exceeding any realistic measure of harm.

For public-facing institutions, the predictable response is **over-deterrence**. Faced with opaque systems and disproportionate risk, institutions withdraw from lawful cultural participation rather than attempt to navigate unclear authorization regimes.

This chilling effect is observable not only through expressive silence, but through institutional exit, contraction of programming, and abandonment of lawful uses.

## VI. METADATA AND PLATFORM NOTICE SYSTEMS ARE NOT ADJUDICATIVE TRUTH

Enforcement determinations are frequently premised on platform metadata and interface-level confirmations treated as dispositive evidence of authorization or lack thereof.

Metadata, however, is non-exclusive, replicable, and subject to error. Platform interfaces are designed for scale, not adjudicative precision. Treating these systems as authoritative substitutes for clear authorization standards externalizes error to parties unable to audit, contest, or correct them.

The Court need not question the utility of such systems to recognize their limits.

## VII. INDIRECT AND FORESEEABLE SOCIETAL IMPACTS

Universities function not merely as expressive actors, but as **distribution infrastructure for culture**. When enforcement architectures govern institutional intermediaries, the resulting constraints propagate system-wide rather than remaining localized.

Downstream audiences—including students, young participants in cultural life, and the general public—do not negotiate licenses or respond to enforcement notices. They nonetheless inherit the narrowed cultural field that results from institutional over-deterrence.

Similarly, the same design assumptions that disadvantage elderly and non-technical users in billing, account management, and platform access contexts disadvantage institutions in attribution and enforcement contexts. Both reflect systems built around continuous monitoring, technical fluency, and rapid dispute response.

These impacts are foreseeable consequences of design, not speculative harms.

## VIII. PRIVATE ENFORCEMENT ARCHITECTURE FUNCTIONS AS GOVERNANCE BY ACCIDENT

The systems at issue were not designed with public-facing institutions in mind. They were designed to manage monetization, attribution, and risk within private platform ecosystems.

When applied unchanged to universities, these systems effectively set rules for participation without legislative input, regulatory oversight, or ex ante standards. Courts are increasingly asked to resolve disputes that arise not from disagreement over rules, but from the **absence of any authoritative, user-visible rules at all.**

This is not an allegation of misconduct. It is a structural observation.

## IX. AMBIGUITY PRESERVES DISCRETION WHILE FORECLOSING COMPLIANCE

Clear rules constrain power. Ambiguous systems preserve discretionary flexibility.

The absence of a single, user-visible authorization standard preserves enforcement optionality while foreclosing ex ante compliance. Parties are exposed to liability without any stable mechanism to determine authorization in advance.

This condition explains the recurrence of disputes across institutions, sectors, and contexts.

---

## X. THE COURT MAY RECOGNIZE THESE STRUCTURAL LIMITS WITHOUT DECIDING THE MERITS

Amici do not ask the Court to interpret license terms, adjudicate damages, or assign fault. The Court may, however, recognize that:

- automated enforcement systems were designed for commercial platforms;
- public-facing institutions lack the capacity those systems assume;
- liability attaches without intelligible ex ante standards; and
- application of such systems in educational contexts creates foreseeable over-deterrence.

Recognition of these limits does not undermine copyright protection. It clarifies the boundaries of enforcement architecture as it migrates into public life.

---

## CONCLUSION

This case illustrates how **automated, platform-based copyright enforcement architectures now govern public-facing institutions by default**, without modification or accommodation for their distinct role and constraints.

Neutral acknowledgment of this structural reality would assist courts in applying liability standards that remain administrable, proportionate, and coherent—reducing disputes driven not by intentional misconduct, but by **architectural incoherence, recursive reliance traps, delayed attribution, and information asymmetry**.

*See* **Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.**, 20 Cal. 4th 163, 180 (1999) (warning against judicial endorsement of liability regimes that function as ad hoc regulation rather than application of clear, prospective rules).

---

Respectfully submitted,

**/s/ Joseph Anthony Reyna**

Joseph Anthony Reyna (JoeCat®)

Pro Se Amicus Curiae

Independent Artists and Songwriters

Austin, TX

WhiteHat@JoeCattt.com

Dated: **December 24, 2025**

# EXHIBIT INDEX

*(Exhibits Not Attached; Available Upon Request of the Court)*

The following exhibits are referenced in support of the structural, economic, and administrative observations contained in the Brief of Amicus Curiae of Independent Artists and Songwriters. Due to volume and to avoid unnecessary burden on the Court, the exhibits are **not attached** but are **maintained by Amicus and available immediately upon request.**

---

# EXHIBIT A

## Platform-Scale Licensing and Aggregated Authorization Agreements

**Description:**
Representative licensing agreements, purchase orders, and blanket authorization documents evidencing non-exclusive, multi-year licenses covering broadcast, digital, internet, streaming, and social-media uses of music.

**Purpose:**
Demonstrates that rights holders routinely market and sell aggregated authorization for the same categories of use later asserted as unauthorized in enforcement actions, supporting the Brief's discussion of simultaneous licensing and litigation postures.

---

# EXHIBIT B

## Automated Attribution, Metadata, and Notice-Based Enforcement Systems

**Description:**
Technical documentation, industry reports, and internal platform materials describing how music attribution, identification, and enforcement determinations are generated through metadata matching, automated notice systems, and platform interfaces.

**Purpose:**
Supports the Brief's explanation that enforcement determinations rely on non-adjudicative, opaque systems not designed for ex ante compliance or institutional audit.

---

11

## EXHIBIT C

### Unauthorized Scraping and Replication of Platform Music Metadata

**Description:**
Public reporting, technical analyses, and incident summaries documenting large-scale unauthorized scraping of music files and metadata from a major streaming platform via account-level and API-based access.

**Purpose:**
Illustrates the non-exclusive, replicable, and fragile nature of metadata often treated as authoritative for attribution and enforcement purposes.

---

## EXHIBIT D

### Government Consumer-Protection Records Involving Platform Opacity

**Description:**
Correspondence and complaint records generated by state Attorneys General involving digital platform billing disputes, account access failures, and automated systems affecting elderly and non-technical users.

**Purpose:**
Demonstrates foreseeable harms arising from systems that assume continuous monitoring, technical fluency, and rapid dispute response—paralleling the same design assumptions embedded in copyright enforcement architecture.

---

## EXHIBIT E

### Streaming Royalty Pool and Pro Rata Distribution Analyses

**Description:**
Economic analyses, industry studies, and academic literature explaining pooled revenue models, pro rata allocation, and the relationship between visibility, enforcement, and redistribution within fixed royalty pools.

**Purpose:**
Supports the Brief's observation that suppression, enforcement, and monetization are


mathematically interdependent within pooled systems, and that enforcement decisions redistribute value within fixed pools.

## EXHIBIT F

### Historical Case Studies of Automated Monetization and Enforcement

**Description:**
Historical materials addressing prior technology transitions (including ringtones, satellite radio, and early digital music services) where automated monetization systems produced similar patterns of opacity, delayed accounting, and downstream enforcement.

**Purpose:**
Demonstrates that the structural contradictions described in the Brief are not novel, but repeatable across technological eras.

## EXHIBIT G

### Algorithmic Visibility, Cultural Suppression, and Long-Term Market Effects

**Description:**
Reports and studies analyzing how algorithmic ranking, playlisting, and visibility controls shape cultural consumption, artist exposure, and market participation over time.

**Purpose:**
Supports the Brief's discussion of indirect and long-term impacts on cultural participation, youth audiences, and emerging creators resulting from institutional over-deterrence.

## EXHIBIT H

### Institutional Capacity and Audit Limitations

**Description:**
Materials documenting the practical limits faced by universities, public institutions, and non-commercial actors in auditing platform-level attribution systems and reconciling overlapping licensing regimes.

**Purpose:**
Supports the Brief's assertion that even well-resourced institutions lack the access and technical capacity assumed by automated enforcement architecture.

---

## EXHIBIT I

### Delayed Accounting, Unmatched Works, and Revenue Allocation Gaps

**Description:**
Industry reports and analyses addressing delayed royalty accounting, unmatched works, and the temporal gap between use, attribution, and payment.

**Purpose:**
Illustrates how delay operates as a structural feature that externalizes error and uncertainty to downstream users and creators.

---

## EXHIBIT J

### Comparative Enforcement Patterns Across Sectors

**Description:**
Summaries of litigation and enforcement actions involving retail brands, educational institutions, media entities, and public-facing organizations arising under substantially similar theories.

**Purpose:**
Demonstrates that the dispute at issue reflects a systemic and repeatable condition rather than an isolated disagreement.

---

### AVAILABILITY STATEMENT

All exhibits listed above are maintained by Amicus Curiae and are available for submission or inspection **immediately upon request of the Court**. Amicus has withheld physical attachment solely to avoid unnecessary burden and duplication of voluminous materials.

---

## CERTIFICATE OF SERVICE

I, **Joseph Anthony Reyna**, hereby certify that on **December 24, 2025**, I caused a true and correct copy of the following documents to be served on counsel of record for all parties in the above-captioned matter:

- Motion for Leave to File Amicus Curiae Brief
- Brief of Amicus Curiae of Independent Artists and Songwriters in Support of Neither Party

Service was effected as follows:

**Electronic Mail Service**

On **December 24, 2025**, copies of the above documents were served via electronic mail upon counsel of record at the email addresses listed below.

**U.S. Mail Service**

Due to the federal holiday schedule, physical copies were deposited with the **United States Postal Service on December 27, 2025**, for delivery via **Nonprofit U.S. Mail**, addressed as set forth below.

Electronic service was utilized as a reliable and sufficient method of notice and has been routinely accepted in Movant's ongoing federal litigation, including *Reyna v. United States Postal Service, et al.*, No. 1:25-cv-04275 (D.D.C.). Physical mailing was provided in an abundance of caution to ensure completeness of service.

## SERVICE ADDRESSES

**Counsel for Plaintiffs (Sony Music Entertainment, et al.)**

**Pryor Cashman LLP**

7 Times Square

New York, NY 10036

Electronic Mail:

- Benjamin K. Semel — bsemel@pryorcashman.com
- Kaveri Banka Arora — karora@pryorcashman.com
- Rachel Kaplowitz — rkaplowitz@pryorcashman.com

---

**Counsel for Defendant (University of Southern California)**

**Haynes and Boone, LLP**

30 Rockefeller Plaza, 22nd Floor

New York, NY 10112

Electronic Mail:

- Joseph C. Lawlor — jlawlor@haynesboone.com
- Richard D. Rochford, Jr. — rrochford@haynesboone.com

---

**Additional Counsel (Served in an Abundance of Caution)**

**Haynes and Boone, LLP**

98 San Jacinto Boulevard, Suite 1500

Austin, TX 78701

Electronic Mail:

- Michael J. Lambert — michael.lambert@haynesboone.com

---

**Haynes and Boone, LLP**

2801 N. Harwood Street, Suite 2300

Dallas, TX 75201

Electronic Mail:

- Jason P. Bloom — jason.bloom@haynesboone.com

---

I declare under penalty of perjury that the foregoing is true and correct.

Executed on **December 24, 2025**, in **Austin, Texas**.

Respectfully submitted,

/s/ **Joseph Anthony Reyna**

Joseph Anthony Reyna (JoeCat®)

Pro Se Amicus Curiae

Independent Artists and Songwriters

Austin, TX

WhiteHat@JoeCattt.com

Dated: **December 24, 2025**

Dreams Over Dollars
10 Balcones Dr. #16077
Austin, Texas 78731




Pro se

United States District Court – SDNY
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, NY 10007-1312

RECEIVED
SDNY PRO SE OFFICE
2026 JAN -5 PM 3: 34

Nonprofit Organization – Authorized by U.S. Postal Service